**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Robert E. Blackburn**

Civil Action No. 13-cv-02105-REB-MJW

COLORADO CHRISTIAN UNIVERSITY,

    Plaintiff,

v.

KATHLEEN SEBELIUS, in her official capacity as Secretary of the United States Department of Health and Human Services;
THOMAS E. PEREZ, in his official capacity as Secretary of the United States Department of Labor;
JACOB J. LEW, in his official capacity as Secretary of the United States Department of the Treasury;
UNITED STATES DEPARTMENT OF HEALTH AND
HUMAN SERVICES;
UNITED STATES DEPARTMENT OF LABOR; and
UNITED STATES DEPARTMENT OF THE TREASURY,

    Defendants.

## ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

**Blackburn, J.**

This matter is before me on the **Plaintiff's Motion To Expedite Summary Judgment or, in the Alternative, For a Preliminary** Injunction [#64][1] filed March 31, 2014. The defendants filed a response [#65] and the plaintiff filed a reply [#66]. Having considered carefully all relevant evidence educed, all reasons stated, all arguments advanced, all authorities cited, and all apposite law, I find and conclude that the motion

---

[1] "[#64]" is an example of the convention I use to identify the docket number assigned to a specific paper by the court's case management and electronic case filing system (CM/ECF). I use this convention throughout this order.

for preliminary injunction should be granted.[2] I deny the alternative request of the plaintiff for expedited consideration of its pending motion for summary judgment.

## I. JURISDICTION

I have jurisdiction over this case under 28 U.S.C. § 1331 (federal question).

## II. BACKGROUND

The plaintiff, Colorado Christian University (CCU), challenges certain requirements imposed on group health plans by the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010) (Affordable Care Act or ACA) and regulations implementing the ACA. Specifically, CCU challenges the requirement that the group health plans for employees of CCU and for CCU students or, in the alternative, another entity, provide coverage for drugs, devices, procedures, or related education and counseling that may destroy human life after fertilization of the egg of a mother and either before or after the implantation of a fertilized egg in the uterus of its mother. CCU contends that any participation by them in the implementation of this required coverage imposes a substantial burden on the exercise of its religious beliefs and violates its rights under the First Amendment of the Constitution of the United States and under the Religious Freedom Restoration Act (RFRA)[3].

Included with the motion for preliminary injunction is the affidavit of William Armstrong, the President of CCU. Mr. Armstrong says CCU is "a 'Christ-centered' liberal arts university committed to offering a complete education that develops students

---

[2] The issues raised by and inherent to the motion are sufficiently briefed; thus, obviating the necessity for evidentiary hearing or oral argument.

[3] 42 U.S.C. §§ 2000bb through 2000bb-4.

intellectually, professionally, and spiritually. Although CCU does not affiliate with any specific denomination, it is united with the broad, historic evangelical faith." *Declaration of President William L. Armstrong in Support of Plaintiff's Motion for Partial Summary Judgment* [#64-1] (Armstrong Declaration), ¶¶ 5-6. "(A)s part of its commitment to a Christian education, CCU believes and actively teaches that each human being bears the image of God, and that all human life is sacred from the moment of conception. Promoting the sanctity of life is one of CCU's Strategic Objectives." *Id.*, ¶¶ 13 - 14. The current CCU student health plan excludes coverage for abortions and all contraceptives, including emergency contraceptives. *Id.*, ¶ 19. The current CCU employee health plan excludes coverage for all services, drugs, and devices that could terminate human life from the moment of conception, including medical abortions, emergency contraceptives like Plan B and Ella, and IUDs. CCU's employee health plan does provide coverage for other contraceptives. *Id.*, ¶ 20. Mr. Armstrong says CCU excludes these coverages "because their ability to prevent an embryo from implanting in the uterus ends an innocent human life. It would be a violation of CCU's religious beliefs concerning the sanctity of life . . . to deliberately arrange insurance coverage that facilitates access to abortion-inducing drugs and devices or related educational counseling services." *Id.*, ¶ 21 - 22. The CCU employee health plan is a self-insured plan.

The ACA requires many health insurance plans to provide coverage for women's "preventative care and screenings [as] . . . provided for in comprehensive guidelines supported by the Health Resources and Services Administration[.]" See 42 U.S.C. § 300gg - 13(a)(4). The details of this requirement are expatiated in regulations adopted to implement the statutory requirement. 29 C.F.R. § 147.130 (a)(1)(iv) states the basic

requirement, with reference to other resources for the details. This requirement now includes "all Food and Drug Administration approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity." Health Resources & Services Administration, "Women's Preventive Services Guidelines," www.hrsa.gov/womensguidelines (visited April 10, 2014). I will refer to this aspect of the ACA and regulations as the Preventative Care Coverage Requirement.

CCU objects to a portion of the Preventative Care Coverage Requirement. The religious objections of CCU are limited to coverage for drugs, devices, or procedures that may destroy human life after fertilization of the egg of a mother and either before or after the implantation of a fertilized egg in the uterus of its mother, as well as any related counseling or education. The objections of CCU include surgical abortion, the so-called morning after pill, also know as Plan B, the week afer pill, also known as Ella, and intra uterine devices. For purposes of this order, I will refer to this part of Preventative Care Coverage Requirement as the Mandate.

After the enactment of the ACA, the government adopted administrative regulations which provide a religious exemption from the Preventative Care Coverage Requirement. The current regulations provide an exemption from the Preventative Care Coverage Requirement for organizations like CCU. The exemption relevant to this case includes the following four criteria, all of which must be satisfied for the exemption to be applicable:

> (1) The organization opposes providing coverage for some or all of any contraceptive services required to be covered under § 147.130(a)(1)(iv) on account of religious objections.
>
> (2) The organization is organized and operates as a nonprofit entity.
>
> (3) The organization holds itself out as a religious organization.
>
> (4) The organization self-certifies, in a form and manner specified by the Secretary, that it satisfies the criteria in paragraphs (b)(1) through (3) of this section, and makes such self-certification available for examination upon request by the first day of the first plan year to which the accommodation in paragraph (c) of this section applies. The self-certification must be executed by a person authorized to make the certification on behalf of the organization, and must be maintained in a manner consistent with the record retention requirements under section 107 of the Employee Retirement Income Security Act of 1974.

29 C.F.R. § 2590.715-2713A. An organization that satisfies these quadripartite criteria is an "eligible organization." Under 29 C.F.R. § 2590.715-2713A (b), an eligible organization is deemed to have complied with the requirements of the Preventative Care Coverage Requirement. An eligible organization is "not required to contract, arrange, pay, or refer for contraceptive coverage . . . ." See Coverage of Certain Preventive Services Under the Affordable Care Act, 78 FR 39870-01, 39874 (section II(B)(2)).

The process necessary to invoke the exemption is relatively simple. The organization seeking the exemption must complete and execute a short form certifying that it meets the first three criteria. The form, titled EBSA Form 700 - Certification, requires the organization to provide its name, the name of the individual authorized to make the certification for the organization, and the mailing address, email address, and phone number for that individual.[4] I will refer to this form as the Exemption Form. In the

---

[4] The form can be viewed at dol.gov/ebsa/pdf/preventiveserviceseligibleorganizationcertificationform.pdf.

case of an organization with a self-insured health plan, such as the CCU employee health plan, the organization must deliver the Exemption Form to the third-party administrator (TPA) of its plan along with a list of the employees of the organization.

Once the Exemption Form is properly completed, executed, and delivered, the eligible organization is not obligated to comply with the Mandate and is not obligated to administer or pay for the coverages required by the Mandate.  Rather, the Exemption Form "shall be treated as a designation of the third party administrator as the plan administrator" for any "contraceptive services required to be covered" under the Preventative Care Coverage Requirement "to which the eligible organization objects on religious grounds . . . ."  29 C.F.R. § 2510.3-16 (b).  The TPA then is obligated to provide or arrange for separate payments for contraceptive services for persons insured by the plan as required by the ACA.  The TPA is reimbursed for costs it incurs when it provides such coverage.

After the TPA receives the Exemption Form, it must notify female employees who are covered by the health plan of the eligible organization that the TPA will cover and administer the preventive services required by the ACA, including the services that are the subject of the Mandate.  29 C.F.R. § 2590.715-2713A (d).  Self-insured eligible organizations "must not, directly or indirectly, seek to interfere with a third party administrator's arrangements to provide or arrange separate payments for contraceptive services for participants or beneficiaries, and must not, directly or indirectly, seek to influence the third party administrator's decision to make any such arrangements."  29 C.F.R. § 2590.715-2713A (b)(1)(iii).

In short, when an eligible organization properly completes, executes, and delivers the Exemption Form, the organization is not obligated to comply with the Mandate.  The

6

organization is not required to administer or fund health insurance coverages required by the Mandate. Rather, the third party administrator of the health plan of the organization must arrange to provide those coverages.

The next plan year for the CCU employee health insurance plan begins on July 1, 2014. The next plan year for the CCU student health insurance plan begins on August 21, 2014. CCU is required to comply with the ACA, including the specific requirements described above, when the plan year for each of these plans begins in 2014. According to CCU, it now faces a choice: (1) it can violate its religious beliefs and provide the health insurance coverage required by the Mandate; (2) it can stop providing health insurance coverage for the employees of CCU, and face prodigious penalties; (3) it can continue to provide health insurance coverage without the coverages required by the Mandate, and face prodigious penalties; or (4) it can violate its religious beliefs and complete, execute, and deliver the Exemption Form.

In the view of CCU, the fourth option, the Exemption Form, triggers a process which results in the provision of the religiously objectionable insurance coverages required by the Mandate. Taking an action which initiates such a process, CCU contends, violates its religious beliefs. Mr. Armstrong represents that "(e)xpressly designating CCU's third party administrator as an ERISA plan and claims administrator and notifying the administrator of its obligations under the final regulations would make CCU morally complicit in providing the objected-to drugs and services. By maintaining a plan that facilitates access to abortifacients and self-certifying that it will not directly pay for them, CCU would be arranging for access to abortifacients and referring its plan participants to the third party administrator or insurer for payments. Acting as a conduit for these products violates CCU's Christian faith." *Armstrong Declaration* [#64-1], ¶¶ 23

- 25. Notably, failure to provide the coverages required by the Mandate, failure to execute the Exemption Form, and cancellation of the health insurance plan of CCU to avoid the Mandate each would subject CCU to substantial financial penalties. **See Roman Catholic Archdiocese of Atlanta v. Sebelius,** 2014 WL 1256373, *4 (N.D. Ga. Mar. 26, 2014).

### III. PRELIMINARY INJUNCTION - STANDARD OF REVIEW

FED. R. CIV. P. 65 authorizes federal courts to issue preliminary injunctions. Because a preliminary injunction is an extraordinary remedy, the right of a party to such relief must be clear and unequivocal. **See Federal Lands Legal Consortium ex rel. Robart Estate v. United States**, 195 F.3d 1190, 1194 (10th Cir. 1999). The plaintiffs are entitled to a preliminary injunction only if they prove (1) that there is a substantial likelihood that they will prevail on the merits; (2) that they will suffer irreparable harm unless the preliminary injunction is issued; (3) that the threatened injury to the plaintiffs outweighs the harm the preliminary injunction might cause defendants; and (4) that the preliminary injunction is in the public interest. **Prairie Band of Potawatomi Indians v. Pierce**, 253 F.3d 1234, 1246 (10th Cir. 2001).

### IV. ANALYSIS

#### A. LIKELIHOOD OF SUCCESS

To secure a preliminary injunction, a plaintiff must establish a substantial likelihood that it is likely to prevail on the merits of the substantive claim or claims that are the basis for its motion. **Prairie Band of Potawatomi Indians v. Pierce**, 253 F.3d 1234, 1246 (10th Cir. 2001). However, "[t]he determination of a motion for a preliminary injunction and a decision on the merits are different." **Valdez v. Applegate**, 616 F.2d 570, 572 (10th Cir. 1980). "It is not necessary that plaintiffs show positively that they will

prevail on the merits before a preliminary injunction may be granted." ***Atchison, Topeka and Santa Fe Railway. Co. v. Lennen***, 640 F.2d 255, 261 (10th Cir. 1981). Instead, a plaintiff need only establish "a reasonable probability of success, . . . not an 'overwhelming' likelihood of success[.]" ***Id.***

CCU asserts, *inter alia*, claims under the Religious Freedom Restoration Act, the Establishment Clause of the First Amendment, the Free Exercise Clause of the First Amendment, and the Free Speech Clause of the First Amendment. I conclude that CCU has shown a substantial likelihood that it will prevail on its RFRA claim. As a result, I do not analyze this factor as to its other claims.[5]

### 1. RFRA - Substantial Burden

Under the RFRA, the "Government shall not substantially burden a person's exercise of religion." 42 U.S.C. § 2000bb-1(a). To prevail on a claim under this section of the RFRA, the plaintiff must show: (1) it wishes to engage in a religious exercise; (2) which is motivated by a sincerely held belief; and (3) which exercise is subject to a substantial burden imposed by the government. ***See Abdulhaseeb v. Calbone***, 600 F.3d 1301, 1312 (10th Cir. 2010) (applying the Religious Land Use and Institutionalized Persons Act). The term "substantial burden," as used in the Religious Land Use and Institutionalized Persons Act (RLUIPA), addressed in ***Abdulhaseeb***, is to be interpreted by reference to the Religious Freedom Restoration Act of 1993. ***Grace United Methodist Church v. City Of Cheyenne***, 451 F.3d 643, 661 (10th Cir. 2006). Under either act, the substantial burden standard is the same.

To evaluate the RFRA claim of CCU, the court must identify the apposite

---

[5] "A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them." ***Lyng v. Nw. Indian Cemetery Protective Ass'n***, 485 U.S. 439, 445 (1988).

religious belief, determine whether such belief is sincere, and decide whether the government, via the Mandate, has placed "substantial pressure on the religious believer." ***Hobby Lobby***, 723 F.3d at 1140. In this case, the relevant religious beliefs of CCU are summarized in paragraphs two through eight of the **Verified Complaint** [#1] and in paragraphs 13 through 26 of the **Declaration of President William L. Armstrong in Support of Plaintiff's Motion for Partial Summary Judgment** [#64-1]. There is no dispute that the beliefs in question are religious beliefs, and there is no dispute that these beliefs are sincerely held religious beliefs of CCU. Thus, only the third factor is at issue: whether the government has imposed a substantial burden on the relevant exercise of religion.

To determine if a burden is substantial, a court must determine if the burden puts "substantial pressure on an adherent to modify his behavior and to violate his beliefs." ***Abdulhaseeb***, 600 F.3d at 1315 (internal quotation and citation omitted). The government imposes a substantial burden on religious exercise if it (1) requires participation in an activity prohibited by a sincerely held religious belief; (2) prevents participation in conduct motivated by a sincerely held religious belief; or (3) places substantial pressure on an adherent . . . to engage in conduct contrary to a sincerely held religious belief. ***Hobby Lobby***, 723 F.3d at 1315.

Under the ACA and the regulations, CCU has essentially four options. It may: (1) refuse to provide employee health insurance coverage; or (2) provide the coverage required under the Mandate in its employee health insurance plan; or (3) provide a health insurance plan for its employees that does not include the coverages required by the Mandate; or (4) execute and deliver the Exemption Form and declare itself to be exempt from the Mandate. The first option would subject CCU to prodigious financial

penalties. Without dispute, CCU asserts that the second option would violate its religious beliefs. Option three obviously would be a violation of the ACA and would subject CCU to ruinous penalties. Thus, CCU is essentially constrained to consider the fourth option – whether to seek exemption status.

However, CCU contends that completion, execution, and delivery of the Exemption Form would violate its religious beliefs. This is true, according to CCU, because execution and delivery of the Exemption Form triggers or initiates a process which results in the provision of the coverages required by the Mandate to the employees and students of CCU. Taking an action which initiates and facilitates such a process, CCU contends, violates its religious beliefs. Thus, CCU contends, the government has given it a Hobson's choice: violate its sincerely held religious beliefs or face ruinous financial penalties. This choice, CCU asserts, exerts and constitutes a substantial – and thus impermissible – burden on the exercise of its religion.

Courts have lined up on opposites sides of the debate. For example, in ***Zubik v. Sebelius***, ___ F. Supp. 2d ___, ___, 2013 WL 6118696 (W.D. Pa. Nov. 21, 2013), the court addressed an exemption for a religious organization under the ACA. As in this case, the plaintiffs in ***Zubik*** asserted that the affirmative acts of signing the Exemption Form stating the religious objections of the plaintiffs, compiling a list of the employees of the organization, and providing those items to its heath insurer or third-party administrator is an action which imposes a substantial burden on their exercise of religion. Referring to the exemption process as the "accommodation," the court agreed:

> (U)nder the "accommodation," the reason the documentation is required is so that contraceptive products, services, and counseling can be provided in direct contravention of Plaintiffs' sincerely-held religious beliefs. The Government is asking Plaintiffs for documentation for what Plaintiffs sincerely believe is an immoral purpose, and thus, they cannot provide it.

11

*Id*. at *25.

> (A)lthough the "accommodation" legally enables Plaintiffs to avoid directly paying for the portion of the health plan that provides contraceptive products, services, and counseling, the "accommodation" requires them to shift the responsibility of purchasing insurance and providing contraceptive products, services, and counseling, onto a secular source. The Court concludes that Plaintiffs have a sincerely-held belief that "shifting responsibility" does not absolve or exonerate them from the moral turpitude created by the "accommodation"; to the contrary, it still substantially burdens their sincerely-held religious beliefs.

*Id*.

The holding in ***Univ. of Notre Dame v. Sebelius***, 743 F.3d 547 (7th Cir. 2014), is to the contrary. In ***Notre Dame***, the Seventh Circuit held that execution and delivery of the Exemption Form does not trigger or enable the objectionable coverage and does not constitute a substantial burden on religion under the RFRA.

> The accommodation in this case consists in the organization's (that is, Notre Dame's) washing its hands of any involvement in contraceptive coverage, and the insurer and the third-party administrator taking up the slack under compulsion of federal law. Notre Dame is telling [its health insurance providers]: "we're excused from the new federal obligation relating to contraception," and in turn, the government tells those insurance companies "but you're not." This is a warning, not a trigger. It enables nothing. The sole "enabler" is the federal statute that Notre Dame has been allowed to opt out of.

*Id*. at 557. "The delivery of a copy of the form to [a health insurance provider] reminds it of an obligation that the *law*, not the university, imposes on it - the obligation to pick up the ball if Notre Dame decides, as is its right, to drop it." *Id*. at 555. In essence, the Seventh Circuit concluded, the religious objections of Notre Dame are to the independent action of the government in mandating contraceptive coverage, not to any action that the government has required Notre Dame to take. *Id*. at 559. Given these circumstances, the Seventh Circuit held that the Exemption Form does not constitute a substantial burden on the exercise of religion under the RFRA. *Id.*

*Id*. at *25.

> (A)lthough the "accommodation" legally enables Plaintiffs to avoid directly paying for the portion of the health plan that provides contraceptive products, services, and counseling, the "accommodation" requires them to shift the responsibility of purchasing insurance and providing contraceptive products, services, and counseling, onto a secular source. The Court concludes that Plaintiffs have a sincerely-held belief that "shifting responsibility" does not absolve or exonerate them from the moral turpitude created by the "accommodation"; to the contrary, it still substantially burdens their sincerely-held religious beliefs.

*Id*.

The holding in ***Univ. of Notre Dame v. Sebelius***, 743 F.3d 547 (7th Cir. 2014), is to the contrary. In ***Notre Dame***, the Seventh Circuit held that execution and delivery of the Exemption Form does not trigger or enable the objectionable coverage and does not constitute a substantial burden on religion under the RFRA.

> The accommodation in this case consists in the organization's (that is, Notre Dame's) washing its hands of any involvement in contraceptive coverage, and the insurer and the third-party administrator taking up the slack under compulsion of federal law. Notre Dame is telling [its health insurance providers]: "we're excused from the new federal obligation relating to contraception," and in turn, the government tells those insurance companies "but you're not." This is a warning, not a trigger. It enables nothing. The sole "enabler" is the federal statute that Notre Dame has been allowed to opt out of.

*Id*. at 557. "The delivery of a copy of the form to [a health insurance provider] reminds it of an obligation that the *law*, not the university, imposes on it - the obligation to pick up the ball if Notre Dame decides, as is its right, to drop it." *Id*. at 555. In essence, the Seventh Circuit concluded, the religious objections of Notre Dame are to the independent action of the government in mandating contraceptive coverage, not to any action that the government has required Notre Dame to take. *Id*. at 559. Given these circumstances, the Seventh Circuit held that the Exemption Form does not constitute a substantial burden on the exercise of religion under the RFRA. *Id.*

Based on the careful review of these competing cases, I find the ratiocination of the court in **Zubik** to be the more cogent, *a fortiori*, given the important rights at stake. Thus, I approve, adopt, and incorporate its *ratio decidendi*.

Analysis of the burden imposed on the religious beliefs of a plaintiff can begin to bleed into an assessment of the validity or credibility of those beliefs or the sincerity of those beliefs. Here, however, the sincerity of the beliefs of CCU is conceded. Thus, an assessment of the validity or credibility of those beliefs by the court is not appropriate. **United States v. Lee**, 455 U.S. 252, 257 (1982) (It is not within the judicial function or judicial competence to determine whether an appellee or the government has the proper interpretation of the relevant religious faith; courts are not arbiters of scriptural interpretation; citing **Thomas v. Review Bd. of Indiana Employment Security Div.**, 450 U.S. 707, 716 (1981)).

> How little Plaintiffs must do to qualify for the accommodation would be highly relevant if they objected only to paying for contraceptives directly. Taking a few minutes to complete some paperwork would hardly be a significant burden on their religious exercise. But because Plaintiffs also object to executing the self-certification, the government's argument amounts to disbelief that the self-certification has much religious significance. And adopting this argument would therefore require an examination of the sincerity of Plaintiffs' professed beliefs – which the government does not question – or second-guessing the importance or rationality of Plaintiffs' convictions – a task beyond the Court's ability or competence.

**Ave Maria Found. v. Sebelius**, ___ F. Supp. 2d___, ___, 2014 WL 117425, *5 (E.D. Mich. Jan. 13, 2014).

> Courts may still evaluate whether a law pressures a litigant to modify her behavior and whether that pressure is significant. But having conceded that the accommodation requires Plaintiffs to change their behavior in some way – here, by executing a certification – the government cannot then label that newly required action as trivial. It is not the government's business to decide what behavior has religious significance. Only when a law or regulation requires no action or forbearance by a religious objector

can the government dismiss otherwise significant burdens on religious exercise offhand.

*Id*.

Any myopic focus on the brevity of the Exemption Form and its ease of completion misses the mark. It is the *de facto* forced facilitation of the objectionable coverage that is religiously repugnant. The resultant moral abhorrence is not effectively extenuated by a transfer of responsibility via the Exemption Form from CCU to the TPA or another entity. Such legal legerdemain does not expiate the morally unacceptable means or end. Such a compelled concession by an ostensibly innocuous legal prophylactic does not ameliorate the ignominy of the moral obliquity created by the participation in the process.

Further, it is of no moment that ultimately the decision by an employee to elect the objectionable coverage is optional. It is the offer that is morally offensive regardless of the extent of its acceptance.

For the reasons summarized above, CCU says either providing the health insurance coverage required under the Mandate or execution and delivery of the Exemption Form, the EBSA Form 700 - Certification, which effectively exempts CCU from the Mandate, both would violate its religious beliefs. If CCU refused to provide health insurance coverage for its employees, or if CCU provided a health insurance plan for its employees that did not include the coverages required by the Mandate, CCU would be subject to significant – if not ruinous – financial penalties imposed under the ACA. In short, the ACA requires CCU to choose to take an action that violates its religious beliefs or to take an action that exposes CCU to substantial financial penalties. Thus, there is a substantial likelihood that CCU can show that the pressure to execute

the Exemption Form imposed on it by the ACA and the concomitant regulations constitutes impermissible pressure to act in violation of its religious beliefs. If so, the ACA and the regulations constitute a substantial burden on the exercise of religion of CCU.

### 2. RFRA - Compelling Governmental Interest & Least Restrictive Means

Under the RFRA, the government may impose a substantial burden on the exercise of religion under certain narrow circumstances. The government "may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person – (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C.A. § 2000bb-1 (b).

In the view of the government, the ACA and the regulations are narrowly tailored to serve compelling governmental interests in public health and gender equality. *Response* [#40], p. 14. As the government notes in its brief, the United States Court of Appeals for the Tenth Circuit rejected this contention. **Hobby Lobby**, 723 F.3d at 1143 - 1144. The Tenth Circuit found that the interests articulated by the government are insufficient because they are broadly formulated interests justifying the general applicability of government mandates and the government offers "almost no justification for not granting specific exemptions to particular religious claimants." *Id*. at 1143 (citing **Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal**, 546 U.S. 418, 431 (2006)). In addition, the Tenth Circuit concluded that

> the interest here cannot be compelling because the contraceptive - coverage requirement presently does not apply to tens of millions of people. As noted above, this exempted population includes those working for private employers with grandfathered plans, for employers with fewer than fifty employees, and, under a proposed rule, for colleges and

15

> universities run by religious institutions. As the Supreme Court has said, "a law cannot be regarded as protecting an interest of the highest order when it leaves appreciable damage to that supposedly vital interest unprohibited." [***Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah***, 508 U.S. 520, 547 (1993)]; ***see also O Centro***, 546 U.S. at 433, 126 S.Ct. 1211 (citing ***Lukumi*** as instructive in determining whether exemptions undermine a compelling government interest for purposes of RFRA). The exemptions at issue here would yield precisely this result: they would leave unprotected all women who work for exempted business entities.

*Id*. at 1143 - 1144.  Because there is not a showing of compelling governmental interest, I need not address the least restrictive means consideration.

### 3.  Conclusion

The only issue in dispute concerning the RFRA claim of CCU is whether the ACA and the regulations, as they relate to CCU and its possible exemption from the Mandate, constitute a substantial burden on the religious beliefs of CCU.  I conclude that there is a substantial likelihood that CCU can show that the ACA and the regulations constitute a substantial burden on the exercise of its religion.  Obversely, the government has not shown that this substantial burden is permissible under the RFRA because the Mandate is in furtherance of a compelling governmental interest.  Thus,  I conclude that CCU has shown a substantial likelihood of success on the merits of its RFRA claim.

### B.  IRREPARABLE INJURY

Establishing a likely violation of the RFRA rights of CCU satisfies the irreparable injury factor.   ***Hobby Lobby***, 723 F.3d at 1146.

### C.  BALANCE OF HARMS

When considering the balance of harms, a court must balance "the competing claims of injury and must consider the effect on each party of the granting or withholding

16

of the requested relief." ***Amoco Prod. Co. v. Gambill***, 480 U.S. 531, 542 (1987). In this case, a preliminary injunction would forestall the ability of the government to require that health insurance coverage of employees of CCU include coverage for drugs, devices, or procedures that may destroy human life after fertilization of the egg of a mother and either before or after the implantation of a fertilized egg in the uterus of its mother, as well as any related counseling or education. Other coverages required by the Preventative Care Coverage Requirement would not be affected by a preliminary injunction. Thus, even with a preliminary injunction, a significant portion of the asserted interest of the government is largely realized while coexisting with the religious objections of CCU. In contrast, absent an injunction, CCU would remain subject to a requirement that likely constitutes a violation of its rights under federal law. Accordingly, I find and conclude that the balance of equities tips in favor of CCU. ***See Hobby Lobby***, 723 F.3d at 1146 (plurality concluding balance of harms factor satisfied).

### D. PUBLIC INTEREST

Generally, the public interest is served by enjoining the enforcement of a law that likely violates the Constitution. ***Chamber of Commerce of U.S. v. Edmondson***, 594 F.3d 742, 771 (10th Cir. 2010). Although a violation of the RFRA is not, on its face, a violation of the constitution, "Congress has given RFRA similar importance by subjecting all subsequent congressional enactments to a strict scrutiny standard of review unless those enactments explicitly exclude themselves from RFRA. *See* 42 U.S.C. § 2000bb-3(b)." ***See Hobby Lobby***, 723 F.3d at 1146 - 1147 (plurality concluding public interest factor satisfied). On the public interest factor, this case is directly analogous to ***Hobby Lobby***. Thus, I find and conclude that the public interest factor weighs in favor of the issuance of a preliminary injunction.

### E. SECURITY

"The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." FED. R. CIV. P. 65(c). I conclude that security in the amount of five hundred (500) dollars is sufficient to satisfy this requirement.

### VI. ORDERS

**THEREFORE, IT IS ORDERED** as follows:

1. That the **Plaintiff's Motion To Expedite Summary Judgment or, in the Alternative, For a Preliminary** Injunction [#64] filed March 31, 2014, is granted to the extent the plaintiff seeks a preliminary injunction;

2. That effective forthwith, each of the defendants is **ENJOINED AND RESTRAINED** from any application or enforcement against the plaintiff of any provision of 42 U.S.C. § 300gg-13(a)(4) and any regulations implementing that provision to the extent the statute and the implementing regulations require the plaintiff to include in the group health plan for employees or students of Colorado Christian University coverage for drugs, devices, or procedures that may destroy a human embryo or fertilized egg of a mother either before or after the implantation of a fertilized egg in the uterus of its mother, as well as any related counseling or education;

3. That effective forthwith, each of the defendants is **ENJOINED AND RESTRAINED** from any application or enforcement against Colorado Christian University of any provision of 42 U.S.C. § 300gg-13(a)(4) and any regulations implementing that provision to the extent the statute and the implementing regulations require Colorado Christian University to execute and deliver the EBSA Form 700 -

Certification in order for the plaintiffs to obtain an exemption from the requirement that Colorado Christian University include in the group health plan for employees of Colorado Christian University coverage for drugs, devices, or procedures that may destroy a human embryo or fertilized egg of a mother either before or after the implantation of a fertilized egg in the uterus of its mother, as well as any related counseling or education;

  4. That effective forthwith, each of the defendants is **ENJOINED AND RESTRAINED** from any application or enforcement against Colorado Christian University of any provision of 42 U.S.C. § 300gg-13(a)(4) and any regulations implementing that provision to the extent the statute and the implementing regulations impose a penalty on Colorado Christian University based on the failure of Colorado Christian University (a) to execute and deliver the EBSA Form 700 - Certification, as provided by law; or (b) to include in the group health plans for employees and students of Colorado Christian University coverage for drugs, devices, or procedures that may destroy a human embryo or fertilized egg of a mother either before or after the implantation of a fertilized egg in the uterus of its mother, as well as any related counseling or education;

  5. That under FED. R. CIV. P. 65(c), Colorado Christian University **SHALL POST** with the clerk of the court a bond or other security in the amount of five hundred (500) dollars on or before Tuesday, June 24, 2014, at 5:00 p.m. (mountain daylight time);

  6. That this preliminary injunction **SHALL REMAIN IN EFFECT** until modified or rescinded by further order of the court; and

  7. That the **Plaintiff's Motion To Expedite Summary Judgment or, in the Alternative, For a Preliminary** Injunction [#64] filed March 31, 2014, is **DENIED** to the

extent the plaintiff seeks expedited resolution of its pending motion for summary judgment.

Dated June 20, 2014, at Denver, Colorado.

**BY THE COURT:**

*Bob Blackburn*
Robert E. Blackburn
United States District Judge